**SAGE PRODUCTS, INC.,**
Plaintiff–Appellant,

v.

**DEVON INDUSTRIES, INC.,**
Defendant/Cross–
Appellant.

Nos. 96–1503, 96–1510.

United States Court of Appeals,
Federal Circuit.

Sept. 18, 1997.

Mark T. Banner, Banner & Witcoff, LTD., Chicago, IL, argued, for plaintiff-appellant. With him on the brief was Laura J. DeMoor. Of counsel was A. Blair Hughes.

Robert C. Weiss, Lyon & Lyon LLP, Los Angeles, CA, argued, for defendant/cross-appellant. With him on the brief was Kenneth H. Ohriner.

Before MAYER, RADER, and SCHALL, Circuit Judges.

RADER, Circuit Judge.

In this patent infringement action, Sage Products, Inc. (Sage) and Devon Industries, Inc. (Devon) cross-appeal the judgment of the United States District Court for the Central District of California. On the parties' cross-motions for summary judgment, the district court held that Devon did not infringe Sage's U.S. Patents Nos. 4,779,728 ('728 patent) and 4,375,849 ('849 patent), and that Sage did not infringe Devon's U.S. Patent No. 4,315,592 ('592 patent). Because the district court properly interpreted the claims of each patent to preclude literal infringement and properly determined that there could be no infringement under the doctrine of equivalents, this court affirms.

## I.

This lawsuit began on April 10, 1992, when Sage sued Devon for infringement of several patents relating generally to containers for disposing of hazardous medical waste, including hypodermic needles. The '728 patent covers a disposal container with a slot at its top to allow entry of waste materials into the container and with constrictive barriers above and below that slot to restrict access to the interior of the container. The '849 patent covers a disposal container with a notched slot for unwinding needles from their accompanying syringe.

Devon counter-sued on its own patent, the '592 patent. That patent covers a disposal container with two slotted baffles that allow a person to deposit waste products into the container without contacting the materials already therein.

Acting on cross-motions for summary judgment, the district court held that neither party infringed the other party's patents either literally or by equivalents. Therefore, the district court entered judgment for Sage and Devon on the corresponding claims of the other. Both parties now appeal.

## II.

Sage's '728 patent discloses a disposal container that allows a user to deposit hazardous medical waste without touching waste already in the container. Figure 3 of the patent, reproduced below, illustrates the claimed features. The disposal container 10 includes a container body 12 with an elongated slot 16 at its top. A barrier, having a first constriction 18 and a second constriction 20, restricts access to the interior of the container body. Closure 28 closes the container.

F i g. 3.

The only independent claim of the '728 patent (with emphasis to highlight disputed elements) reads:

1. A disposal container comprising:
 a. a hollow upstanding container body,
 b. *an elongated slot at the top of the container body* for permitting access to the interior of the container body,
 c. barrier means disposed adjacent said slot for *restricting* access to the interior of said container body, at least a portion of said barrier means comprising

 i. *a first constriction extending over said slot,* and

 ii. a complementary second constriction extending beneath said slot, and

 d. a closure disposed adjacent said slot.

The district court properly interpreted "top of the container body" to mean the "highest point, level, or part of." The court

also properly interpreted "extending over said slot" to require that the first constriction be "above" the elongated slot. The patentee nowhere indicated any intention to deviate from these ordinary meanings of the claim terms. Thus, they control. *See York Prods., Inc. v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed.Cir.1996) ("Without an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning.").

Before the district court, Sage presented an infringement argument summarized in the following marked-up patent drawing. The drawing is taken from Devon's U.S. Patent No. 5,080,251, which the parties agree accurately depicts Devon's accused products.

■ According to its argument, Sage identified an interior part 40 as the first constriction, a second interior part 52 as the second constriction, and the space between them as the elongated slot. Based on this argument, the district court properly found no literal infringement. Even assuming that Sage has identified an elongated slot with a first constriction above it and a second constriction below it, that slot is not "at the top of the container body." Instead, as the undisputed drawing shows, Sage's proposed "elongated slot" on the Devon device lies within the container body. Because this deficiency prevents literal infringement, the district court properly granted summary judgment of no literal infringement.

■ A device that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents if every element in the claim is literally or equivalently present in the accused device. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 934–35, 4 USPQ2d 1737, 1739–40 (Fed. Cir.1987) (in banc). A claim element is equivalently present in an accused device if

only "insubstantial differences" distinguish the missing claim element from the corresponding aspects of the accused device. *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1517–18, 35 USPQ2d 1641, 1645 (Fed.Cir.1995) (in banc), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Although equivalence is a factual matter normally reserved for a fact finder, the trial court should grant summary judgment in any case where no reasonable fact finder could find equivalence. *See War-ner–Jenkinson Co. v. Hilton Davis Chem. Co.,* —— U.S. ——, —— n. 8, 117 S.Ct. 1040, 1053 n. 8, 137 L.Ed.2d 146 (1997) ("Where the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment."). The district court properly discerned that this case falls in that category.

■ Before the trial court, Sage reasserted its literal infringement argument as a basis for finding infringement as an equivalent. Sage also offered three other views of the accused products that a jury might adopt

to find infringement by equivalents. Of Sage's four equivalence arguments, three of them identify element 40 as the accused "first constriction" and element 52 as the accused "second constriction" and place the "elongated slot" somewhere inside the container body.

The district court properly rejected all four of Sage's theories of infringement by equivalents. As the district court recognized, each theory suffers from one of two alternative problems—either the elongated slot is not substantially "at the top of the container body" or there is no first constriction that extends substantially "over said slot." The record does not show that Sage presented any perspective on Devon's accused devices that simultaneously satisfied an insubstantial variation of both of these limitations. Specifically, Sage's first three theories place the location of the "elongated slot" in this accused device far enough within the container body that, as a matter of law, no reasonable juror could find that it is located at substantially the "top of the container." Furthermore, the district court properly found that Sage's fourth theory of equivalence, identifying element 26 from the Devon patent drawing as the "first constriction," fails because element 26 is a hinged member that does not substantially "constrict access" to the slot, if at all.

Unable to conform its claim of infringement by equivalents to the strictures of the claim limitations, Sage essentially argues that having two constrictions below the top of the container is the same, for purposes of infringement, as having one constriction above and one constriction below. According to Sage, the claimed and accused arrangements accomplish substantially the same function, in substantially the same way, to achieve substantially the same result. However, the doctrine of equivalents does not grant Sage license to remove entirely the "top of the container" and "over said slot" limitations from the claim. *See Warner–Jenkinson*, at ——, 117 S.Ct. at 1049 ("It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."); *Pennwalt*, 833 F.2d at 936, 4 USPQ2d at 1741 ("[If] even a single function required by a claim or an equivalent function is not performed [by the accused device], the

[district] court's finding of no infringement must be upheld."); *Dolly, Inc. v. Spalding & Evenflo Cos.*, 16 F.3d 394, 400, 29 USPQ2d 1767, 1771 (Fed.Cir.1994) ("[T]he concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims.").

■ The doctrine of equivalents prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality. *See Hilton Davis*, 62 F.3d at 1517, 35 USPQ2d at 1645 ("The Supreme Court in *Graver Tank* thus made insubstantial differences the necessary predicate for infringement under the doctrine of equivalents." (citing *Graver Tank & Mfg. v. Linde Air Prods. Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950))); *Charles Greiner & Co. v. Mari–Med Mfg., Inc.*, 962 F.2d 1031, 1036, 22 USPQ2d 1526, 1529 (Fed. Cir.1992) (discussing role of doctrine in preventing "fraud on a patent"); *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 805 F.2d 1558, 1572, 231 USPQ 833, 842 (Fed.Cir.1986) ("The doctrine of equivalents ... exists solely for the equitable purpose of 'prevent[ing] an infringer from stealing the benefit of an invention.'" (internal citations omitted)). Applied more broadly, the doctrine would conflict with the primacy of the claims in defining the scope of a patentee's exclusive rights. *See Warner–Jenkinson*, at ——, 117 S.Ct. at 1049 ("[T]he doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement."); *Charles Greiner*, 962 F.2d at 1036, 22 USPQ2d at 1529 (discussing the inherent conflict between the role of the doctrine in preventing "fraud on a patent" and the primacy of the claims in defining the scope of a patentee's exclusive rights). Thus, for a patentee who has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly. If it were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural limitations on which the public could rely. *See, e.g., Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1562, 32

USPQ2d 1225, 1228 (Fed.Cir.1994) ("The doctrine of equivalents cannot be used to erase 'meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'" (internal citations omitted)).

 Once again, this case raises the question of why the law restricts application of the doctrine of equivalents without further fact finding in some cases, see, e.g., id.; Dolly, 16 F.3d at 400, 29 USPQ2d at 1771, while in other cases the law imposes no such restriction, see, e.g., Hilton Davis Chem. Co. v. Warner–Jenkinson Co., 114 F.3d 1161, 1163–64, 43 USPQ2d 1152, 1154–55 (Fed.Cir.1997) (in banc) (after remand from the Supreme Court; order permitting factual analysis of equivalence to stand). The claim at issue defines a relatively simple structural device. A skilled patent drafter would foresee the limiting potential of the "over said slot" limitation. * No subtlety of language or complexity of the technology, nor any subsequent change in the state of the art, such as later-developed technology, obfuscated the significance of this limitation at the time of its incorporation into the claim. See, e.g., Pennwalt, 833 F.2d at 938, 4 USPQ2d at 1742 ("[T]he facts here do not involve later-developed computer technology which should be deemed within the scope of the claims to avoid the pirating of an invention."). If Sage desired broad patent protection for any container that performed a function similar to its claimed container, it could have sought claims with fewer structural encumbrances. Had Sage done so, then the Patent and Trademark Office (PTO) could have fulfilled its statutory role in helping to ensure that exclusive rights issue only to those who have, in fact, contributed something new, useful, and unobvious. Instead, Sage left the PTO with manifestly limited claims that it now seeks to expand through the doctrine of equivalents. However, as between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection for this foreseeable alteration of its claimed structure. Cf. Maxwell v. J. Baker, Inc., 86 F.3d 1098, 1108, 39 USPQ2d 1001, 1007 (Fed. Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1244, 137 L.Ed.2d 327 (1997) (discussing danger of allowing patentee to file and prosecute narrow claims and then, during the course of litigation, expand its exclusive rights under the doctrine of equivalents, thereby avoiding examination of the broad subject matter).

This court recognizes that such reasoning places a premium on forethought in patent drafting. Indeed this premium may lead to higher costs of patent prosecution. However, the alternative rule—allowing broad play for the doctrine of equivalents to encompass foreseeable variations, not just of a claim element, but of a patent claim—also leads to higher costs. Society at large would bear these latter costs in the form of virtual foreclosure of competitive activity within the penumbra of each issued patent claim. Because the doctrine of equivalents blurs the line of demarcation between infringing and non-infringing activity, it creates a zone of uncertainty, into which competitors tread only at their peril. Cf. Markman v. Westview Instruments, Inc., —— U.S. ——, ——, 116 S.Ct. 1384, 1396, 134 L.Ed.2d 577 (1996) (discussing the importance of certainty in defining the scope of exclusive rights). Given a choice of imposing the higher costs of careful prosecution on patentees, or imposing the costs of foreclosed business activity on the public at large, this court believes the costs are properly imposed on the group best positioned to determine whether or not a particular invention warrants investment at a higher level, that is, the patentees.

In sum, the '728 patent claims a precise arrangement of structural elements that cooperate in a particular way to achieve a certain result. Devon achieves a similar result—restricted entry to a medical disposal container—but it does so by a different arrangement of elements. Because this issued patent contains clear structural limitations, the public has a right to rely on those limits in conducting its business activities. This court will not effectively remove such a limi-

---

* This court does not imply that Sage's representation before the Patent and Trademark Office was inadequate. To the contrary, it appears that the claim precisely defines the structure elaborated in the written description and drawings. The public record reflects a manifest intention to claim this structure and no more. Whether actual or constructive, that intention now binds Sage.

tation under a doctrine designed to prevent "fraud on a patent." Accordingly, this court affirms the judgment of the district court that Devon does not infringe the '728 patent, either literally or under the doctrine of equivalents.

■ As a final matter, Sage presents this court with new infringement arguments, raised for the first time on appeal. In short, Sage argues that "elongated slot" really means the three dimensional space that extends from immediately above the claimed container down into its center or alternatively, the "container body" does not extend all the way to the top of Devon's accused device. The arguments show a misunderstanding of the role of this court. This is an appellate court. By and large, it is our place to review judicial decisions—including claim interpretations and grants of summary judgment—

reached by trial courts. No matter how independent an appellate court's review of an issue may be, it is still no more than that—a review. With a few notable exceptions, such as some jurisdictional matters, appellate courts do not consider a party's new theories, lodged first on appeal. If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court. In short, this court does not "review" that which was not presented to the district court. Accordingly, this court declines to consider Sage's novel infringement arguments.

## III.

■ Sage's '849 patent covers a needle removal and disposal device. Figures 1 and 3 of the '849 patent illustrate the claimed device.

Fig. 1

Fig. 3

The claimed device includes a storage container 19 with cap 20. The cap 20 has a slot 22 therein, which is notched so that it grasps the hub 12 of a syringe needle 11 and allows the user to unscrew the needle 11 without touching it. Particularly important to the present dispute, the claimed device also includes a movable closure means that may control access to the slot. In the figures above, the closure means is element 21, a flat disc that rotates about its center point to selectively allow or deny access to slot 22.

In another embodiment illustrated in the patent, the closure means is a hinged lid that drops downward into a locked position to prevent access to the slot or alternatively lifts upward to allow access.

The '849 patent contains two independent claims, both of which are at issue in this appeal. Claims 1 and 10 read (with emphasis to highlight disputed limitations):

1. A needle removal and disposal device for detaching single or double-ended sam-

pling needles which are thread engaged to a syringe body and storing detached sampling needles, said device comprising:

storage container means;

cap means associated with said storage container means, said cap means having a plate means with slot means opening therethrough, said slot means including integral wall means depending into said storage container means, entry port means and a plurality of stepped notches each having a different gap dimension for accommodating different sized needle hub portions; and

*closure means pivotably associated with said plate means and being movable with respect to said slot means for controlling access thereto;*

wherein said device is capable of engaging a sampling needle hub portion at a stepped notch whereby a syringe thread-engaged to a hub portion may be rotated with respect to the hub portion for detachment of a sampling needle, whereby detached needles and hub portions may be deposited through said entry port means into said storage container means, said device providing said storage container means for accumulation of sampling needles subsequent to detachment from syringes, and *whereby said pivotable closure means is capable of moving to close access to said slot means and provide safe storage of sampling needles within said storage container means.*

10. A needle removal and disposal device for use with single or double-ended sampling needles having hub portions thread-engaging a syringe at the hub portion, said device comprising:

cap means having a plate means with slot means opening therethrough, said slot means including entry port means and a plurality of stepped notches, each notch having a different notch gap dimension permitting engagement with different sized needle hub portions, said slot means further including depending wall means integral with said plate means,

*movable closure means pivotably associating with said cap means at pivot means thereof, said movable closure means being selectively movable between an open access*

*and closed access position with respect to said slot means,*

storage container means, associating with said cap means, said slot means opening to said storage container means, and said wall means depending into said storage container means,

wherein said device facilitates detaching a sampling needle from a syringe by engagement of a needle hub portion at a stepped notch and rotation of the syringe with respect to said sampling needle hub portion, whereby a detached sampling needle and associated hub portion may be deposited through said entry port means for storage within said storage container means therebelow.

The parties' dispute centers on the undisputed fact that Devon's accused product has a flat hinged lid that can be left open, or alternatively placed in a closed position. However, once closed, Devon's lid locks in place and does not reopen. Thus, the parties argue about whether the claims require the "closure means" or "movable closure means" to move freely from a closed position to an open position. This court upholds the district court's conclusion that the claims require this movable opening and closing feature.

As a starting point, the parties dispute whether the relevant element in each claim invokes means-plus-function treatment. The use of the word "means," which is part of the classic template for functional claim elements, gives rise to "a presumption that the inventor used the term advisedly to invoke the statutory mandates for means-plus-function clauses." *York Prods.*, 99 F.3d at 1574, 40 USPQ2d at 1623; *see also Greenberg v. Ethicon Endo–Surgery, Inc.*, 91 F.3d 1580, 1584, 39 USPQ2d 1783, 1786–87 (Fed. Cir.1996). However, the presumption is not conclusive. For example, where a claim uses the word "means," but specifies no corresponding function for the "means," it does not implicate section 112. *See, e.g., York Prods.*, 99 F.3d at 1574, 40 USPQ2d at 1624 (construing "means" in claim without reference to section 112, paragraph 6). Likewise, where a claim recites a function, but then goes on to elaborate sufficient structure, ma-

terial, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format. *See, e.g., Cole v. Kimberly–Clark Corp.,* 102 F.3d 524, 41 USPQ2d 1001 (Fed.Cir.1996).

In the present case, the "closure means" of claim 1 and the "movable closure means" of claim 10 use the word "means" and, thereby, presumptively implicate section 112, paragraph 6. Both claims recite a function for the "means"—that is, closing the slot means. They also require that the closure means perform the additional functions of "controlling access" to the slot (claim 1) or being "selectively movable between an open access and closed access position" (claim 10). Neither claim explicitly recites the structure, material, or acts needed to perform these functions. Thus, the means-plus-function limitations invoke the interpretation regimens of section 112, paragraph 6.

After identifying the "specified function" of the unrecited means, a court must consult the specification to define the structure, material or acts corresponding to this claimed function. 35 U.S.C. § 112, µ 6. As the district court observed, the specification makes clear the structure that corresponds to the "closing" function. There are two embodiments. In the first, a rotatable disc with an opening sits above the container cap. The disc rotates so that its opening exposes the slot means in the cap, or alternatively, so that it blocks access to the slot means. In this way, the rotatable disc allows the user selective access to the container. The second embodiment uses a hinged flap that can be pressed down to cover the slot means, or alternatively pulled up to allow access to the slot means. Both embodiments allow the user to move the closure means from the closed position to the open position and back.

Further, the claims contain further functional recitations that require an openable lid. Specifically, claim 1 requires that the closure means perform the additional function of "controlling access" to the slot means. Likewise, claim 10 requires that movable closure means be "selectively movable between an open access and closed access position with respect to said slot means." Thus, as the district court found, the structure disclosed for the claimed "closing" function is a pivotable lid that can be moved to and from

the open and closed positions. To be an equivalent of these disclosed means under section 112, paragraph 6, a structure must perform these express functions.

Looking to the rest of the intrinsic evidence of claim meaning, this court discerns further confirmation that the claims require a closure means that reopens. The written description expressly describes the importance of an openable closure means. For example, the patent describes how the closure means in one preferred embodiment works:

> Cap means 51 includes slot means 53 having access thereto controlled by a closure means, such as closure lid 54, which includes a hinged pivot means rather than the previously described rotatable access aperture.... *This arrangement permits lid 54 to cover cap means 51 and then to pivot upward, as shown in phantom, to allow access to slot means 53. ... Pivoting movement to the closed or open position is made possible by the user grasping handle 60 to pivot lid 54 downward or upward.*

'849 patent, column 6, lines 43–61 (emphasis added). Further, in the summary of the invention, the patentee described the usefulness of the claimed invention:

> The invention further provides a movable lid for closure of the storage container. The lid permits safe transportation to a refuse disposal, and *portability for carrying on the person from patient to patient.*

'849 patent, column 1, lines 61–64 (emphasis added). Unless the lid reopened, it would not facilitate carrying the disposal container "from patient to patient." Finally, and most importantly, the written description expressly indicates the importance of choosing a closure means that allows movement to an open position:

> Movable closure means need not be limited to the circular disc-like formation for lid 21 and may also comprise different shapes, *provided movement to closed and open positions with respect to slot means 22 is attained.*

'849 patent, column 5, lines 30–34 (emphasis added).

This court also finds support for the district court's claim interpretation in the prosecution history. During prosecution of the application leading to the '849 patent, the applicant argued:

The British [prior art] patent, similar to the device shown in the German [prior art] patent, offers a relatively deformable top with a narrow opening wherein no hint or suggestion is found for the accommodation of a closure, *more particularly a pivotable closure, for granting or denying access to the slot means.*

Amendment (September 13, 1982), p. 3 (emphasis added). In light of this record, this court concludes that the district court correctly interpreted the claims to require a closure means that moves from a closed position to an open position and back, to control access to the slot means.

Having properly interpreted the claims, the district court rightly considered whether the accused devices could infringe. As indicated above, the accused devices have lids that lock closed and cannot be moved back into an open position. Under the district court's correct claim interpretation, these lids do not fall within the literal scope of the claims. The trial court correctly foreclosed literal infringement.

Even where an accused device falls outside the literal bounds of a claim, it may still infringe under the doctrine of equivalents if every claim element is literally or equivalently present in the accused device. *See Hilton Davis,* 62 F.3d at 1518, 35 USPQ2d at 1645. However, "[i]t is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner–Jenkinson,* at ——, 117 S.Ct. at 1049. Thus, in cases where the patentee's theory of equivalents would "entirely vitiate a particular claim element, partial or complete summary judgment should be rendered by the court." *See id.* at —— n. 8, 117 S.Ct. at 1053 n. 8; *Pennwalt,* 833 F.2d at 935, 4 USPQ2d at 1739 ("That [function-way-result] formulation, however, does not mean one can ignore claim limitations.").

In this case, as in every case involving the doctrine of equivalents, Sage seeks to cover by equivalents that which it cannot cover literally. Sage argues that the use of a permanently locking lid is equivalent, for purposes of the claimed invention, to an openable lid. However, such an application of the doctrine of equivalents would effectively remove an express functional requirement of the claims, namely the "control access" function. By its use of means-plus-function limitations, the patentee in this case indicated some flexibility about what means would suffice to perform the "closing" function. Perhaps if there was nothing further to limit the scope of the claims, this court might reach a different conclusion about the permissible scope of equivalents. However, there is more. The patentee claimed additional functional restrictions—the ability to "control access" or to be "selectively movable between an open access and a closed access position"—that are not met by the accused devices. The patentee also instructed, in the written description, that "movement to closed and open positions" was the only critical restriction on the structure, material, or acts that could be used as a "closure means."

These functional limitations on the closure means, expressly recited in the claims and the written description, focus the function-way-result analysis for purposes of the doctrine of equivalents. An accused element cannot perform substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed element if it does not perform at least a function equivalent to that expressly recited in the claimed element. Put another way, a jury could not find the differences between the claimed and accused devices insubstantial without ignoring these claimed functions in their entirety. A jury has no license to do so. *See, e.g., Conopco,* 46 F.3d at 1562, 32 USPQ2d at 1228 ("The doctrine of equivalents cannot be used to erase 'meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.' " (internal citations omitted)).

Where a patent claim recites a specific function for an element of the claim and the written description reiterates the importance of that particular function, a patentee may not later argue, during the course of litigation, that an accused device lacking that functionality is equivalent. *See, e.g., Penn-*

*walt,* 833 F.2d at 938, 4 USPQ2d at 1742–43 ("Having secured claims only by including very specific *functional* limitations, Pennwalt now seeks to avoid those very limitations under the doctrine of equivalents. This it cannot do."). To hold otherwise would be to frustrate the important "definitional and public-notice functions of the statutory claiming requirement." *Warner–Jenkinson,* at ——, 117 S.Ct. at 1049. Thus, under the circumstances of this case, the trial court properly granted judgment as a matter of law that

Devon did not infringe the claims of the '849 patent.

## IV.

■ Like the other patents-in-suit, Devon's '592 patent relates to a receptacle for disposing of expendable items, such as hazardous medical waste, without allowing a user to contact previously accumulated waste. Figure 1 of the '592 patent illustrates the claimed features.

Fig. 1

A container 10 has two baffles 11 and 12 that are used to close the container. Each baffle 11 or 12 has an opening 15 or 16 through which expendable items, such as used syringes, can be deposited. As discussed below, the claim requires that the openings be horizontally offset from one another to minimize the chance of a user coming into contact with previously deposited waste.

Claim 1, the only independent claim of the '592 patent, reads (with emphasis to highlight disputed limitations):

1. A receptacle for receiving expendable items, said receptacle including a container, a first baffle generally closing the top of said container and defining *a first opening through said first baffle* of such size and shape to receive said expendable items therethrough, a second baffle disposed below said first baffle, said second baffle defining *a second opening therethrough* of such size and shape to receive said expend-

able items, *said second opening being horizontally displaced from said first opening,* said first baffle and said second baffle defining a space therebetween sufficient to allow said expendable items to pass through said first opening, between said first baffle and said second baffle, and through said second opening to be received within said container.

For purposes of summary judgment, the parties have focused their dispute on the highlighted portions of the claim, specifically, the requirements (1) that the first and second openings pass "through" the first and second baffles, and (2) that the first and second openings be horizontally displaced from one another so that deposited waste travels laterally as it passes through the space between the two baffles. On these points, the district court properly interpreted the claims.

First, the claim requires that the first and second openings pass "through" the first and

second baffles. The district court properly construed this term to mean that each opening extends from one side of the baffle to the other. *See Webster's Third New International Dictionary* (1981) (defining "through" as "into at one side or point and out at another, especially the opposite side of") (quoted by district court). Although there are other possible meanings for "through," including one cited by Devon that means something more like "allowing passage," these definitions are not used in connection with an "*opening* through" another structure, such as a baffle. Thus, the ordinary meaning of the claim term "through," which controls in the absence of an extraordinary usage by the patentee, *see York Prods.*, 99 F.3d at 1572, 40 USPQ2d at 1622, requires that the first and second openings pass from one side of each baffle to the other.

The written description confirms this straightforward construction of the claim language. There, the patentee shows openings that pass "through" the baffles—that is from one side of each baffle to the other. *See* '592 patent, figures 1–6. Also, in describing the operation of the claimed receptacle, the written description says that "an item can be placed through the opening 15 as shown by the arrows [in Figure 3]." *See id.*, col. 3, lines 39–41. The arrows shown in Figure 3 demarcate a path passing from one side of baffle 15 through the baffle to the other side of baffle 15. Finally, the written description

also teaches forming the openings by "cutting" the baffle. *See id.*, col. 3, lines 1–2. Such "cutting" would not be needed if, as Devon avers, "through" merely meant "past."

Finally, the prosecution history does not show any unique usage of the word "through" that would contradict its plain meaning. Rather, during the prosecution of the application leading to the '592 patent, the applicant referred to each baffle as a "flap having *a hole therethrough.*" Amendment, filed August 3, 1981, p. 3 (emphasis added). That is, the applicant used the word "hole" as a synonym for "opening," thereby clearly indicating that an "opening through [a] baffle" extends from one side of the baffle to the other.

The district court also properly construed the claims to require a horizontal offset between the first and second openings, so that deposited waste passes through the first opening, then through a space between the baffles in which it must travel laterally, and finally through the second opening. In this regard, the claim requires that the "second opening be[ ] horizontally displaced from said first opening."

Under that correct construction, Sage's products do not infringe. The parties agree that the preferred embodiment of the '728 patent accurately depicts Sage's accused products. That embodiment, altered to show Devon's infringement allegations, is shown below:

D.Ct. Mem. & Order (Sept. 14, 1994), p. 29.

Even if a jury found that Sage's first and second curved cowls (labeled 18 and 20) are "baffles" as required by the claims of the '592 patent, no reasonable jury could find that the second baffle has an opening that passes "through" it. At best, the second opening identified by Devon on the above figure is "adjacent" the accused baffle, whereas the claim requires that the opening go through the baffle. Moreover, even accepting Devon's identification of first and second openings (as labeled above), there is no horizontal displacement between the first and second accused openings such that deposited material must move sideways before falling through the second opening. Rather, the "first opening" identified by Devon overlies entirely the "second opening." Without the claimed horizontal displacement between the two openings, a needle dropped at the center of the arc formed by Sage's cowls would pass directly through the first and second openings identified by Devon without ever traveling in a horizontal direction. Thus, the district court properly concluded that Sage's accused products do not literally infringe the '592 patent.

Turning to the doctrine of equivalents, this court must determine whether the claim elements literally missing from the accused products may nonetheless be present by equivalents. *See Warner–Jenkinson,* at ——, 117 S.Ct. at 1049. Sage's accused products do not literally infringe the '592 patent because (1) the second opening is not "through" the second baffle, and (2) the displacement between the first and second openings does not necessarily cause deposited waste to travel horizontally on its fall into the receptacle. The prosecution history of the application that led to the '592 patent reveals the importance of these limitations and reveals why, as a matter of law, there can be no infringement in this case.

The examiner rejected all claims of the application, as originally filed, over U.S. Patent No. 4,121,755 (the Meseke prior art patent). *See* Examiner's Action (May 6, 1981). The examiner also cited two other references that showed relevant features, U.S. Patent Nos. 1,603,024 (the Childs prior art patent) and 3,226,007 (the Thies prior art patent). *Id.* To distinguish the cited art, the applicant amended the claims to require that the second baffle have an opening therethrough, that the first and second openings be horizontally displaced from one another, and that there be a space defined by the baffles. The applicant then explained:

It is thought that claim 1 now precisely claims the truly novel aspect of the device of the present invention since claim 1 claims the container having two baffles, or box flaps, closing the top of the box, *each of the flaps having a hole to receive items to be placed into the box, but the holes are offset and there is a space between the two flaps to allow the items to pass through the first hole, sideways, and through the second hole.*

[The Meseke prior art patent] discloses two flaps closing the top of the box only when the box has been filled and the flaps permanently close the opening. Thus, there can be no arrangement as is now claimed in claim 1.

[The Childs prior art patent] discloses two flaps across the top of a box, but the flaps are contiguous and *the holes through the two flaps are aligned.* Thus, [the Childs prior art patent] does not disclose the arrangement claimed in claim 1.

Amendment (Aug. 3, 1981), p. 3–4 (emphasis added).

This passage shows that the applicant surrendered some claim scope in exchange for issuance of the '592 patent. Specifically, before the examiner's required amendments, the claims covered containers that used a second baffle without an opening. However, the claim amendments specifically added this requirement, making it clear that one could not infringe the claim without an opening through the second baffle. Likewise, the original claims covered containers with a first opening directly overlying a second opening. However, the applicant surrendered that coverage in order to overcome prior art rejections, and limited the claims to containers with a horizontal offset between the first and second openings.

■ A patentee is not free to retrade or renege on a deal struck with the PTO during patent prosecution. *See Mark I Marketing Corp. v. R.R. Donnelley & Sons, Co.,* 66 F.3d 285, 291–92, 36 USPQ2d 1095, 1099–1100

(Fed.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996). When an applicant distinguishes prior art by surrendering some previously-claimed subject matter, the patentee may not later seek to recover that surrendered subject matter by the doctrine of equivalents. *See id.; see also Warner–Jenkinson,* at —— – ——, 117 S.Ct. at 1049–50. The '592 patent can only reach Sage's accused products if waste being *deflected by,* as opposed to *passing through,* a baffle is within a legally permissible range of equivalents. As set out by the prosecution history above, it is not. By the same token, the '592 patent can only reach Sage's accused products if having a first opening directly above a second opening, as opposed to horizontally displaced, is within a legally permissible range of equivalents. Again, it is not. Thus, the district court properly determined that there could be no infringement under the doctrine of equivalents.

## V.

In accordance with this opinion, this court affirms the district court's summary judgment of non-infringement on all three patents.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*