MOORE U.S.A. INC., and Toppan Forms Co., Ltd., Plaintiffs,

v.

The STANDARD REGISTER COMPANY, Defendant.

No. 98–CV–485C(F).

United States District Court, W.D. New York.

March 22, 2001.

Nixon & Vanderhye P.C. (Robert A. Vanderhye, James D. Berquist, of counsel), Arlington, VA, Cohen Swados Wright Hanifin Bradford & Brett (Laurence B. Oppenheimer, of counsel), Buffalo, New York, for plaintiffs.

Oblon, Spivak, McClelland, Maier & Neustadt, P.C. (Charles L. Gholz, William T. Enos, of counsel), Arlington, VA, Gib-

son, McAskill & Crosby (Brian P. Crosby, of counsel), Buffalo, New York, for defendants.

CURTIN, District Judge.

## INTRODUCTION

Currently pending before the court are defendant Standard Register Company's ("SRC") motion for partial summary judgment (Item 100) and plaintiff Moore North America's cross-motion for partial summary judgment (Item 179). Both motions concern the issue of whether defendant SRC has infringed a pressure-sensitive adhesive that is covered by United States Patent 4,918,128 ("the '128 patent").

## FACTS

The '128 patent-or the "adhesive patent" as it has come to be known in this litigation-is directed to a pressure-sensitive adhesive that takes the form of a latex ("the patented adhesive").[1] The patented adhesive was designed for use in the C–Fold mailer technology, which this court has addressed in prior related motions. Apparently, the patented adhesive was a significant improvement over the prior art of adhesives used with C–Fold mailers.[2] The patented adhesive has a hard, non-tacky quality, and it seals only when pressure is applied—as opposed to when the adhesive comes into contact with heat or moisture. As a result, the patented adhesive can be applied to the face of C–Fold mailers, and the mailers can be stacked like ordinary paper in a printing tray without causing the printer to jam or be damaged when mailers are fed through. *See* Item 101, Exh. 1, Column 1, lines 5–64.

In the context of the present motions, Moore alleges that SRC has infringed the '128 patent through the use of *three* different pressure-sensitive adhesives. The first accused adhesive will be referred to as "SRC Adhesive 1." The second accused adhesive will be referred to as "SRC Adhesive 2."[3] The third and final accused SRC adhesive will be referred to as "SRC Adhesive 3."

## I. Chemical Composition of the Patented Adhesive

Claim 1 of the '128 patent describes an adhesive composed of natural rubber which is "graft copolymerized"[4] with a combination of methyl methacrylate ("MMA") and styrene. In addition, the patented adhesive calls for the mixing-in of a hard, fine, non-thermoplastic matter. Claim 1 specifically reads: "A pressure-sensitive adhesive which comprises in admixture: (a) natural rubber graft copolymerized with styrene and methyl methacrylate in the form of a latex; and (b) a finely divided hard particulate matter having no

---

1. In this case, the term "latex" is commonly defined as a "water emulsion of a synthetic rubber or plastic obtained by polymerization and used especially in … adhesives." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (obtained online at *http://www.m-w.com/cgi-bin/ dictionary* ).

2. Moore maintains that the '128 patent was such a remarkable improvement over the prior art in adhesives that it was a revolutionary and "pioneering" patent. *See generally* Item 183, pp. 1–2 and Exh. Q, ¶¶ 3–6.

3. The court uses the title "SRC Adhesive 2" strictly for convenience. Indeed, SRC denies having ever used this adhesive.

4. The chemical process of "polymerizing" or "polymerization" is commonly defined as "a chemical reaction in which two or more molecules combine to form larger molecules that contain repeating structural units." Similarly, polymerization can be understood as an "aggregation of chemical species to form (as with hydrogen bonds) loosely bound complexes." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (obtained online at *http://www.m-w.com/cgi-bin/ dictionary* ).

thermoplasticity dispersed in the latex." Item 101, Exh. 1, Column 4, lines 53–58.

The patent also states that the adhesive's "preferred embodiments" involve a "polymeric constituent" of

natural rubber graft-copolymerized with styrene and methyl methacrylate.... The amounts of the styrene and methyl methacrylate with which the natural rubber is graft-copolymerized are preferably in the ranges of 2 to 10 parts by weight [for styrene] and 10 to 25 parts by weight [for the MMA] per 100 parts by weight of the natural rubber....

Item 101, Exh. 1, Col. 2, lines 6–15.

SRC focuses a great deal of attention on the five "examples" and the three "comparative examples" that are set forth in the "preferred embodiment" section of the '128 patent. *See* Item 101, Exh. 1, Columns 2–3. All five of the "examples" call for graft-copolymerizing MMA and styrene onto natural rubber. However, Comparative Example No. 2 calls for a "pressure-sensitive adhesive ... prepared in substantially the same formulation as in the preparation of [the first example] except that the modified natural rubber latex was prepared by the graft-copolymerization of 15 parts by weight of methyl methacrylate alone per 100 parts by weight of natural rubber with omission of styrene as the grafting monomer." Item 101, Exh. 1, Column 3, lines 29–35.

## II. Prosecution History of the '128 Patent

Claim 1 of the '128 patent is the patent's only "independent claim." In other words, each of the other four enumerated claims do not stand on their own since they incorporate Claim 1 by reference. The inventor, a Mr. Sakai of Japan, and his employer, Toppan of Japan, first filed an application to patent the pressure-sensitive adhesive in December 1988. On June 26, 1989, the Patent and Trademark Office rejected their application. Item 183, p. 4. In its notice to Mr. Sakai, the PTO stated: "Claims 1–5 are rejected under 35 U.S.C. 112, ... as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and/or for failing to point out and distinctly claim the subject matter which applicant regards as the invention." Item 183, Exh. B, p. 2.[5]

In September 1989, the applicants responded to this rejection by adding a few key terms to Claim 1 of the application. Specifically, the applicants offered three clarifications: that protection for an "adhesive" was being sought; that the "particulate matter" called for in Claim 1 should be "hard"; and that the end product was a "latex." Item 183, Exh. C, pp. 1–2. In their response, the applicants also stated that they were not seeking protection of the "graft polymerization" process, since the graft polymerization technique was "well known in the art." The applicants went on to explain that they were seeking protection for a "specific polymeric product" and that "the conditions of graft copolymerization can be selected by one skilled

---

**5.** The first and second paragraphs of 35 U.S.C. § 112 provides:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the

same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

in the art once the ingredients are specified." Item 183, Exh. C, p. 4.

Based on these amendments and remarks, the PTO issued the '128 patent without any further substantive changes to the application. *See* Item 183, p. 6 and Exh. A.

## DISCUSSION

The dispute surrounding SRC Adhesive 1 is whether Moore needs to prove that this adhesive contained styrene as part of a graft copolymer, or whether Moore has failed by merely showing that SRC Adhesive 1 contains styrene in some unidentified form. The issue surrounding SRC Adhesive 2 is whether Moore has shown that it actually was one of SRC's adhesives. The dispute surrounding SRC Adhesive 3—which SRC freely admits it has used since 1994—focuses on whether SRC infringed the '128 patent by using natural rubber graft copolymerized with only MMA, rather than natural rubber graft polymerized with a combination of styrene and MMA (as called for in the '128 patent).

The standard for summary judgment is well settled and need not be set forth here.[6] Suffice it to say, though, that summary judgment is as appropriate in patent infringement actions as it is in any other area of law.

### I. Literal Infringement: SRC Adhesives 1 and 2

■ "An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused

of infringing." While claim construction is a question of law, infringement, whether literal or under the doctrine of equivalents, is a question of fact. . . . *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1104–05 (Fed.Cir.2000) (citations omitted). In determining whether the accused product literally infringes the patent at issue in the context of summary judgment, the court must determine whether, as a matter of law, the claims "read on" or cover the accused device or product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir. 1995). Infringement of a claim is proven if the accused product contains every element of a properly construed claim or its equivalent. *See Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed. Cir.1990).

Moore argues that it has submitted uncontroverted proof that SRC Adhesive 1 and SRC Adhesive 2 literally infringe the '128 patent. Moore states that an affidavit from Deborah McCoy (Item 183, Exh. E), a Moore research scientist, represents the "universe of available evidence" on the issue of whether SRC Adhesive 1 and SRC Adhesive 2 literally infringe the '128 patent. Item 183, p. 11. Moore maintains that the McCoy Affidavit conclusively demonstrates that SRC Adhesive 1 and 2 literally infringe the '128 patent. Moore is so confident that the McCoy Affidavit carries the day that it limits its argument on literal infringement to approximately one page. Item 183, pp. 10–11.

As to SRC Adhesive 1, though, Moore has only shown that styrene was present in the adhesive and has not shown that

---

**6.** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Federal Rules of Civil Procedure Rule 56(c). In deciding whether a genuine issue of material fact exists, the court must believe the evidence of the nonmovant and draw all justifiable inferences in the nonmovant's favor. *See Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1104–05 (Fed.Cir.2000).

styrene was present as part of a graft copolymer. Item 219, p. 7. Dr. Joseph Kennedy, an expert retained by SRC, observes that Moore tested SRC Adhesive 1 with a machine known as a Fourier Transform Infrared (FTIR) spectroscope. Item 219, Exh. G, ¶ 31. Kennedy explains that the FTIR technology could only establish that styrene was present in SRC Adhesive 1, but that the FTIR test could never establish the *chemical form* that the styrene took. *See* Item 219, Exh. G, ¶¶ 29–32. For its part, SRC believes that the styrene that Moore detected in Adhesive 1 was part of a "simple blend" and was not part of the graft copolymer claimed in the '128 patent. *See* Item 219, pp. 8–9 (citing Item 219, Exh. E, ¶ 36 and Exh. I).

■ SRC's opposing arguments are well taken. The '128 patent claims a composition of "natural rubber graft copolymerized with styrene and methyl methacrylate." In order to show that SRC Adhesive 1 literally infringes the '128 patent, Moore must show that SRC Adhesive 1 was created by *graft copolymerizing styrene onto natural rubber*. *Compare Moore North America, Inc. v. Adams Investment Co., Inc.*, 4–99–CV–90376 (S.D.Iowa July 27, 2000), attached at Item 219, Exh. K, p. 5 (finding after a *Markman* hearing that the '128 patent could only be literally infringed where styrene was present as part of a graft copolymer). Moore's failure to establish the chemical form that styrene took in SRC Adhesive 1 is fatal to this aspect of Moore's motion for summary judgment.

■ As to the SRC Adhesive 2, SRC points out that Moore has never established that the adhesive it tested in Sep-

tember 1998 was actually an SRC adhesive or came from an SRC form. *See* Item 219, p. 2. Indeed, two witnesses from Moore—McCoy and Mary Murphy—were unable to say with certainty that the alleged SRC adhesive they tested in September 1998 ("SRC Adhesive 2") was, in fact, an adhesive taken from an SRC product. Item 219, Exh. C, pp. 30, 196 and Exh. D, p. 36.

In light of the foregoing, Moore has failed to establish, as a matter of law, that SRC Adhesive 1 and SRC Adhesive 2 literally infringed the '128 patent. Therefore, this portion of Moore's cross-motion for summary judgment is denied (Item 179).

## II. Infringement Under Doctrine of Equivalents: SRC Adhesive 3

■ Products that do not literally infringe may still infringe under the doctrine of equivalents. A product may infringe under the doctrine of equivalents if every element in the claim is equivalently present in the accused product. *See Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35 (Fed.Cir.1987). Equivalency is typically a question of fact. However, as with all fact questions, summary judgment is appropriate where the finder of fact could reasonably draw only one conclusion. *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).[7]

■ "[T]he application of the doctrine of equivalents rests on the *substantiality of the differences* between the claimed and accused products or processes, assessed according to an objective standard." *Hilton Davis Chem. Co. v. Warner–Jenkin-*

7. The doctrine of equivalents prevents an accused infringer from avoiding liability for infringement by changing only minor or insubstantial details of a claimed invention while retaining the invention's essential identity. The doctrine of equivalents is utilized " 'to temper unsparing logic and prevent an infringer from stealing the benefit of the invention.' " *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558 (Fed. Cir.2000).

son, 62 F.3d 1512, 1517–18 (Fed.Cir.1995) (in banc), *rev'd on other grounds* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (emphasis added). Thus, equivalency will be found where there are mere "insubstantial differences" between a certain element or elements of a claim and corresponding aspects of the accused product. A plaintiff invoking the doctrine of equivalents must do more than prove that the patented product and the accused product bear an overall equivalence to one another. Rather, a plaintiff must prove equivalence on a limitation-by-limitation basis. *See Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566 (Fed.Cir. 1996). Plaintiffs must also prove equivalency "with particularized testimony and linking argument." *Id.* at 1567 (quotation and citation omitted).

· ■ The usual test of equivalence is whether the element in the accused composition performs substantially the same *function* in substantially the same way to obtain substantially the same *result* as the claimed element. *See Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). However, this function-way-result test is "not the sole test for equivalency." *Texas Instruments*, 90 F.3d at 1566 (quotation and citation omitted). Rather,

courts often allow juries to consider "other 'objective evidence' " in order to determine "whether the differences between the accused product or process and the claimed invention are insubstantial." *Id.* (citing *Hilton Davis*, 62 F.3d at 1519). "Such [objective] evidence may include evidence of known interchangeability to one of ordinary skill in the art, copying, and designing around. Thus, ... the doctrine of equivalents [is] 'not the prisoner of a formula' and 'the available relevant evidence may vary from case to case.' " *Id.* (citing *Hilton Davis*, 62 F.3d at 1518).

In this case, the crux of the dispute focuses on whether the two adhesives contain equivalent *graft copolymerized natural rubber*.[8] Under the traditional way-function-way-result test, it is apparent that both adhesives use graft copolymerized natural rubber to perform the same *function* in the adhesive. Furthermore, both adhesives achieve the same fundamental result—that is, both use graft copolymerized rubber and finely divided, hard particulate matter to create a hard, non-tacky pressure-sensitive adhesive.[9]

The ultimate question, then, is whether the two adhesives achieve graft copolymerization in the same way. In the patented adhesive, graft copolymerization is accomplished through a blend of MMA and styr-

---

**8.** There appears to be no dispute that Moore's patented adhesive and SRC Adhesive 3 are both latexes that use natural rubber and a finely divided, hard particulate matter.

**9.** During oral argument, counsel for SRC chose to focus more intently on this "result" prong of equivalence. SRC counsel stated that C–Fold mailers using SRC Adhesive 3 can be processed through either SRC's machines or Moore's machines with equal success. *See* Item 219, p. 12. However, counsel indicated that C–Fold mailers using the patented adhesive work only with Moore's machines, but not with SRC's machines. The inescapable inference, according to SRC, is that the two adhesives achieve distinctly dif-

ferent results. While this machine-compatibility comparison does not identify those differences, SRC believes that it conclusively demonstrates that these two adhesives achieve markedly different results. In its reply papers, Moore paid little attention to this issue. *See* Item 223, p. 10 n. 9. At argument, Mr. Berquist maintained that SRC's proffer of evidence on this point was meaningless. It suffices to say that the court cannot know what the value of the machine-compatibility comparison will prove to be. Without having detailed evidence regarding the two C–Fold mailer machines, the court cannot draw any clear conclusions from SRC's claim that Moore's forms do not work in SRC's machines.

ene, with significantly more MMA being present than styrene. In SRC Adhesive 3, graft copolymerization is accomplished solely through the use of MMA. Thus, the ultimate question is whether SRC Adhesive 3 is equivalent to Moore's patented adhesive by virtue of SRC's use of MMA alone rather than a blend of MMA and styrene.

Before the court can reach this ultimate question of equivalence, it must first address SRC's argument that Moore is barred from asserting the doctrine of equivalents. Here, SRC relies on a related case in which the Federal Circuit set forth a number of legal doctrines that may undermine a plaintiff's attempt to invoke the doctrine of equivalents. "Whether the result of the All Limitations Rule, prosecution history estoppel, or the inherent narrowness of the claim language, many limitations warrant little, if any, range of equivalents." *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed.Cir.2000) ("*Moore I*") (citations omitted).

### A. Prosecution History Estoppel: Amendments to Application for Patent

 Under the doctrine of prosecution history estoppel, a patent owner can be estopped from relying upon the doctrine of equivalents when the patent applicant relinquishes coverage of subject matter during the prosecution of the patent, either by amendment or argument. *See Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376–77 (Fed.Cir.1999).[10] In the large majority of cases, prosecution history estoppel applies where the appli-

cant canceled, amended, or added language to an application after learning that the Patent Office Examiner had rejected the application on the basis of prior art. In other words, estoppel typically arises where an applicant has amended an application in order to avoid prior art and secure protection for the claimed invention. *See Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 30–31 & n. 5, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 882 (Fed.Cir.1991); *Andco Environmental Processes, Inc. v. Niagara Environmental Associates, Inc.*, 224 U.S.P.Q. 43, 48 (W.D.N.Y.1984) (Elfvin, J.). However, the Federal Circuit recently held that estoppel can arise whenever a claim is narrowed by amendment, regardless of the reason for making the amendments. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558 (Fed.Cir.2000). In any event, prosecution history estoppel clearly arises from situations where an application was amended and narrowed in response to a patent examiner's objections.

 In this case, the only amendments to the '128 patent's application were the addition of the words "adhesive" and "hard" to the description found in claim 1 and a clarification that the final product was a "latex." By its present motion, SRC does not argue that these amendments create grounds for prosecution history estoppel. Thus, the vast majority of cases involving prosecution history estoppel are not on point, since estoppel generally arises from an amendment to and a narrowing of the patent application. For this

---

**10.** It is the totality of the prosecution history which establishes the "metes and bounds" of the patent grant. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed.Cir.1999). The purpose of prosecution history estoppel is to protect the notice function of claims, "measured from the vantage point of what a com-

petitor was reasonably entitled to conclude." *Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948, 952 (Fed.Cir.1993); *see also CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1319 (Fed.Cir.2000); *Charles Greiner & Co. v. Mari–Med Mfg., Inc.*, 962 F.2d 1031, 1036 (Fed.Cir.1992).

reason, the court rejects SRC's attempt to invoke prosecution history estoppel as a bar to Moore's claim that SRC Adhesive 3 infringes the '128 patent under the doctrine of equivalents.

### B. "Dedicated to the Public": Subject Matter Disclosed but not Claimed in Patent

■ SRC contends that subject matter that was disclosed but not claimed in the '128 patent is "dedicated to the public" and therefore cannot fall within the scope of equivalency.[11] On this issue, SRC is referring to Comparative Example No. 2, which describes a pressure-sensitive adhesive created by "the graft-copolymerization of 15 parts by weight of methyl methacrylate alone per 100 parts by weight of natural rubber with omission of styrene as the grafting monomer." Item 101, Exh. 1, Column 3, lines 29–35. Seizing on the language from the '128 patent, SRC contends that Mr. Sakai's disclosure of a pressure-sensitive adhesive which uses only MMA as a grafting monomer means that Moore cannot now claim that SRC Adhesive 3–which also uses only MMA—infringes the '128 patent under the doctrine of equivalents. In support of this argument, SRC relies on a trio of cases from the Federal Circuit: *Moore I*, 229 F.3d 1091; *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed.Cir.1996); and *YBM Magnex, Inc. v. International Trade Comm'n*, 145 F.3d 1317 (Fed.Cir.1998). *See* Item 220, pp. 4–6.

In *Moore I*, the '464 patent (or "the mailer patent") was at issue. Moore "argue[d] that the written description's teaching that the length of the first and second strips may be about 'half of the length' of the longitudinal marginal portions [gave] rise to a scope of equivalents hat would cover a 'minority'...." 229 F.3d at 1107. The Federal Circuit rejected Moore's contention and, quoting from *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1107 (Fed.Cir. 1996), held that "subject matter disclosed in the specification, but not claimed, is dedicated to the public' in determining infringement under the doctrine of equivalents." *Moore I*, 229 F.3d at 1107. The court then went onto conclude: "Having fully disclosed two distinct embodiments, one in which the first and second longitudinal strips extend a majority of the length of the longitudinal marginal portions, and one in which they do not, Moore is not entitled to 'enforce the unclaimed embodiment as an equivalent of the one that was claimed.'" *Id.* at 1107 (quoting *YBM Magnex, Inc. v. International Trade Comm'n*, 145 F.3d 1317, 1320 (Fed.Cir. 1998)).

In this case, SRC argues that Moore is once again trying to expand the doctrine of equivalents so that it protects an alternative embodiment that was disclosed but not claimed in the prosecution of the patent. As referenced *supra*, SRC refers to the '128 patent's "Comparative Example No. 2." Comparative Example No. 2 describes a pressure-sensitive adhesive in which graft polymerization is achieved *not* with a styrene/MMA blend, but strictly with 15 parts by weight of MMA. SRC likens the present case to *Moore I* and *Maxwell* and argues that the '128 patent discloses but does not claim a pressure-sensitive adhesive in which only MMA is present as the grafting monomer. Item 220, pp. 4–5. Thus, SRC concludes, pressure-sensitive adhesives using only MMA

---

11. Courts have often addressed this "disclosed but not claimed" defense in conjunction with prosecution history estoppel. *See YBM Magnex, Inc. v. International Trade Comm'n*, 145 F.3d 1317, 1321–22 (Fed.Cir. 1998). However, the Federal Circuit recognizes the "disclosed but not claimed" theory as a distinct, though related, defense to the doctrine of equivalents. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1101 n. 3 (Fed.Cir.1996).

as the grafting monomer remain "dedicated to the public." Since SRC Adhesive 3 uses only MMA as a grafting monomer, SRC contends that Moore is barred from asserting infringement under the doctrine of equivalents.

Yet, *Moore I* is not factually on point with the present case. While *Moore I* may have involved the same parties, it also involved a different patent (the '464 patent) and a different accused product (SRC's so-called "Form 1"). The '464 patent claimed a C–Fold mailer that had "first and second strips" of adhesive that were "about 'half of the length' of the longitudinal marginal portions." *Moore I,* 229 F.3d at 1107. The '464 patent also described, but did not claim, an alternative embodiment with "first and second longitudinal strips" of adhesive that *did* not "extend a majority of the length of the longitudinal marginal portions." *Id.* The accused product in *Moore I*—SRC's Form 1—was indistinguishable from this alternative embodiment's description, since the accused form also had longitudinal strips of adhesive extending less than half the length of the margins. Nevertheless, Moore argued that the accused product was equivalent because the '464 patent created "a scope of equivalents covering" mailers with longitudinal strips of adhesive along a mere " 'minority' " of the margins. *Id.* at 1106.

The Federal Circuit rejected Moore's argument. Specifically, the court rejected Moore's insistence that the '464 patent— which claimed strips of adhesive running "half the length" of the margins—could

have a scope of equivalents that included a mailer with strips of adhesive on a "minority" of the margins' length. The court's conclusion in *Moore I* was logical, since both Moore's unclaimed alternative embodiment and SRC's accused mailer had strips of adhesive covering a minority of the longitudinal margins' length.

The unique facts relevant to the court's decision in *Moore I* are not present in this case. Here, the 128 patent discloses "Comparative Example No. 2," in which natural rubber was graft copolymerized with just 15 percent MMA. On the other hand, the accused SRC Adhesive 3 contains natural rubber graft copolymerized with approximately 30 percent MMA. *See* Item 183, Exh. F, pp. 9–10, 13. Thus, the '128 patent has disclosed a pressure-sensitive adhesive in which 15 percent MMA was used, but not one in which 30 percent MMA is used.[12] Unlike the situation in *Moore I*, there is a facial difference between the unclaimed embodiment and the accused product—*i.e.,* a difference of 15 parts of MMA per 100 parts of natural rubber.

Not only is *Moore I* factually distinct from this case, but it also seems limited to its facts when viewed in light of *YBM Magnex* and *Maxwell,* the two cases on which the court in *Moore I* relied. In *YBM Magnex,* the Federal Circuit stated that "the facts in *Maxwell* are not the routine facts of an equivalency determination." *YBM Magnex,* 145 F.3d at 1320. Indeed, *Maxwell* involved a case where the patent applicant had "disclosed two dis-

---

**12.** Without citing to any authority, SRC argues that the difference between 15 percent and 30 percent MMA is a facile distinction; representing Moore's unpersuasive attempt to "limit the public dedication of the MMA embodiment to the precise ratio of ingredients specified in Comparative Example 2...." Item 219, p. 13 n. 11. SRC maintains that the "important point is the disclosure of the

substance, not the amount, as the patent's own claim 1 demonstrates." *Id.* SRC's argument on this point is not persuasive, especially given the fact that the patent at issue here involves chemical formulations. That is, a difference of 15 parts by weight of MMA may well prove to be a significant difference when it comes to creating a pressure-sensitive adhesive.

tinct alternative ways in which pairs of shoes are attached for sale, and claimed only one of them. Both embodiments were fully described in the patent." *Id.* at 1320. The *Maxwell* court found that the "unclaimed alternative ... was distinct from the claimed alternative" and that both embodiments "were fully described in the [patent's] specification." *YBM Magnex*, 145 F.3d at 1320. Based on these particular facts, "the Federal Circuit denied Maxwell the opportunity to enforce the unclaimed embodiment as an equivalent of the one that was claimed." *Id.*

Although *Maxwell* is valid law, the Federal Circuit in *YBM Magnex* has cautioned lower courts not to read *Maxwell* too broadly. The Federal Circuit rejected the idea that its decision in *Maxwell* had created some sort of "blanket rule that everything disclosed but not claimed [in a patent] is barred from access to the doctrine of equivalents, whatever the facts, circumstances, and evidence." *Id.* The court went on to limit *Maxwell* further: "[T]o enlarge *Maxwell* to a broad and new rule of law ... is not only an incorrect reading of *Maxwell* but would bring it into direct conflict with Supreme Court precedent." *Id.* at 1321. Moreover, *YBM Magnex* makes it clear that courts should still look to leading cases such as *Graver Tank and Warner–Jenkinson*, which state that equivalency should usually be judged by the "function-way-result" test and, where appropriate, the evaluation of other relevant evidence. "The fundamentals of the law of equivalency ... were not changed by *Maxwell* as applied to all situations. *Maxwell* did not displace the wealth of precedent that permits determination of equivalency, *vel non*, as to subject matter included in the written description but not claimed." *Id.* at 1322.

In any event, *Maxwell* is not factually on point with this case. In *Maxwell*, the plaintiff was trying to apply the doctrine of equivalents to an accused product that was identical to the alternative embodiment that had been disclosed in the patent. In this case, SRC Adhesive 3 is *not* identical to Comparative Example No. 2, since the former contains 30 percent MMA and the latter called for 15 percent MMA. In the world of chemical engineering, 15 parts by weight of a particular compound could prove to be a significant difference.

Likewise, the court declines to endorse SRC's reliance on *Sage Products Inc. v. Devon Industries Inc.*, 126 F.3d 1420 (Fed. Cir.1997). In *Sage Products*, the court found that the doctrine of equivalents could not apply because the public had a right to rely on the relevant patent's "clear structural limitations." *Id.* at 1425. In that case, the patent at issue covered a plastic container meant to be used "for disposing of hazardous medical waste, including hypodermic needles." *Id.* at 1422. The patent in that case claimed "a disposal container with a slot at its top to allow entry of waste materials into the container and with constrictive barriers above and below that slot to restrict access to the interior of the container." *Id.* The accused product in *Sage* had two "constrictions" *below* the slot, as opposed to one on top of the slot and one below it as described in the patent. *Id.* at 1424. The court found that the patent's limitation on where the barriers should be placed would have been significant to those skilled in the art. *Id.* The court concluded:

> [T]he ... patent [at issue] claims a precise arrangement of structural elements that cooperate in a particular way to achieve a certain result. Devon achieves a similar result—restricted entry to a medical disposal container—but it does so by a different arrangement of elements. Because this issued patent contains clear structural limitations, the public has a right to rely on those limits in conducting its business activities ....

*Sage Products,* 126 F.3d at 1425. The issue of notice to the public underpinned the *Sage Products* court's reasoning.

Unlike the patent in *Sage Products,* the '128 patent contains no similar "clear structural limitations." [13] *Id.* While claim 1 of the '128 patent does call for "natural rubber graft copolymerized with *styrene and methyl methacrylate,*" there is evidence that those skilled in the polymer arts are well aware that MMA can be freely substituted for styrene in an adhesive compound. *See* Item 183, pp. 11–12. Thus, while the difference between the location of two constrictions was significant in *Sage Products,* it is possible that there are only insubstantial differences between rubber copolymerized with styrene and MMA, and rubber copolymerized with just MMA.

For these reasons, this court declines to follow *Moore I* and *Maxwell* and instead heeds the admonition of *YBM Magnex,* where the Federal Circuit advised lower courts to employ the function-way-result test and to look to other relevant evidence when determining whether the doctrine of equivalents applies.

## C. All Elements Rule and Inherent Narrowness Doctrine

 Before the court can take up the question of equivalency, however, it must also address SRC's contention that the so-called "All Elements Rule" precludes Moore's attempt to assert the doctrine of equivalents against SRC Adhesive 3. *See generally* Item 219, pp. 15–20. In *Warner–Jenkinson,* the Supreme Court articulated the All Elements Rule in the following way:

Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be

applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

520 U.S. at 29, 117 S.Ct. 1040. "'Element' may be used to mean a single limitation, but it has also been used to mean a series of limitations which, taken together, make up a component of the claimed invention." *Corning Glass,* 868 F.2d at 1259.

In this case, SRC maintains that Moore cannot, on an element-by-element basis, show that SRC Adhesive 3 contains an equivalent component for each claimed element in the '128 patent. SRC observes that the '128 patent claims natural rubber copolymerized with styrene and MMA. SRC insists that natural rubber, styrene, and MMA are all separate elements of the '128 patent. SRC argues that Moore cannot use the doctrine of equivalents to "read out" the term "styrene" and the term "and" from claim 1 of the '128 patent. In other words, SRC argues that its use of *just MMA* in SRC Adhesive 3 cannot be equivalent to Moore's use of *styrene and MMA* in the patented adhesive. SRC implies that it would be redundant and absurd for an adhesive to claim "natural rubber copolymerized with MMA and MMA." SRC concludes that the absence of styrene from SRC Adhesive 3 means that SRC Adhesive 3 cannot, as a matter of law, infringe the '128 patent under the doctrine of equivalents. *See* Item 219, pp. 7–8.

Here, SRC again tries to liken this case to *Sage Products.* In *Sage Products,* the plaintiff sought to apply the doctrine of equivalents to a container with two con-

---

**13.** While *Sage Products* involved a relatively simple plastic container, this action involves a complicated chemical substance.

strictions below the top of the container, yet the patent described one constriction above the container's top and one below it. The court in *Sage Products* found that applying the doctrine of equivalents to the accused container would unacceptably read out "top of container" and "over said slot" from the plaintiff's patent. SRC argues that Moore, like the plaintiff in *Sage Products,* is trying to use the doctrine of equivalents to read out the phrase *"styrene and"* from claim 1 of the '128 patent. Moreover, SRC states that if Mr. Sakai and Toppan had desired broader protection, they should have applied for a patent covering an adhesive with *either styrene or MMA* as a polymerizing agent. *See* Item 220, p. 10.

SRC's reliance on the All Elements Rule fails to acknowledge that an inquiry into equivalency usually involves a sensitive, case-by-case inquiry.

> What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case.... In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents.... *An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.*

*Graver Tank,* 339 U.S. at 609, 70 S.Ct. 854 (emphasis added). In this case, Moore has submitted evidence to support a finding that those skilled in the polymer art are thoroughly familiar with the interchangeability of MMA and styrene. *See* Item 223, Exh. S, pp. 57–58, 61–62. Furthermore, a plaintiff is "free to frame the issue of equivalency, if it chooses, as equivalency to a combination of limitations." *Corning Glass,* 868 F.2d at 1259 n. 6 (citing *Winans v. Denmead,* 56 U.S. (15 How.) 330, 343, 14

L.Ed. 717 (1853)). Finally, while an equivalent "for every limitation of the claim" is "generally" found "in a corresponding component" of the accused device, certain situations require the court to assess "equivalency between a required ... combination of limitations and what has been allegedly substituted therefor in the accused device...." *Id.* at 1260.

In light of the foregoing, the All Elements Rule does not preclude Moore from pursuing its theory that SRC Adhesive 3 infringes the '128 patent under the doctrine of equivalents because the patented pressure-sensitive adhesive uses approximately 10 percent styrene and 20 percent MMA and SRC Adhesive 3 differs insubstantially in that it uses 30 percent MMA for the same function in order to achieve the same result.

### D. Equivalence of MMA and Styrene

■ Having dealt with prosecution history estoppel, subject matter dedicated to the public, and the All Elements Rule, the court is left with the relatively straightforward question of whether SRC Adhesive 3 is equivalent to the patented adhesive. This question, in turn, can be distilled into the simpler question of whether styrene and MMA are interchangeable for the purposes of graft copolymerizing natural rubber in a pressure-sensitive adhesive.

As the court noted previously, equivalency is a jury question unless there are no disputed issues of material fact. *See Warner–Jenkinson,* 520 U.S. at 39 & n. 8, 117 S.Ct. 1040. The present record includes two detailed affidavits addressing the issue of equivalency, one from Dr. Timothy Long for Moore (Item 183, Exh. G) and another from Dr. Rejendra Mehta for SRC (Item 219, Exh. E). These affidavits and other evidence in the record reveal a sharp disagreement over the equivalency of styrene and MMA. It would be inappropriate

for the court to resolve this disagreement at the summary judgment stage. Therefore, both parties' motions for summary judgment are denied with respect to SRC Adhesive 3.

## CONCLUSION

Moore has not conclusively established the chemical form that styrene took in SRC Adhesive 1. As a result, Moore has failed to prove that SRC Adhesive 1 literally infringes the '128 patent. Therefore, this aspect of Moore's cross-motion for summary judgment is denied (Item 179).

Moore has also failed to prove that SRC ever used the alleged SRC Adhesive 2, much less that this accused adhesive literally infringed the '128 patent as a matter of law. Therefore, this aspect of Moore's cross-motion for summary judgment is also denied (Item 179).

Finally, the parties agree that the so-called SRC Adhesive 3 does not literally infringe the '128 patent. Accordingly, SRC's motion for partial summary judgment (Item 100) is granted as to literal infringement. However, there are disputed material facts relating to the issue of whether SRC Adhesive 3 infringes the '128 patent under the doctrine of equivalents. Therefore, this aspect of SRC's motion for partial summary judgment is denied (Item 100) and the relevant aspect of Moore's cross-motion for partial summary judgment (Item 179) is also denied.

So ordered.